UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

DAVID JOHNDROW, )
)
    *Plaintiff,* )
) Case No. 1:21-cv-296
v. )
) Judge Atchley
UNUM LIFE INSURANCE COMPANY )
OF AMERICA, and UNUM GROUP, ) Magistrate Judge Steger
)
    *Defendants.* )

## MEMORANDUM OPINION & ORDER

Before the Court is Plaintiff David Johndrow's Motion for Judgment on the ERISA Record [Doc. 69]. On August 31, 2023, the Court found that Unum had improperly denied long-term disability benefits to Plaintiff, and remanded the case to the plan administrator with instructions to obtain a relevant independent medical examination prior to making a benefits determination. [Doc. 30]. After extensive review of the record, the Court finds that Plaintiff has shown by a preponderance of the evidence that, as of March 9, 2021, he was disabled within the meaning of the Policy. Plaintiff's Motion for Judgment on the ERISA Record [Doc. 69] will be **GRANTED** and Unum's denial of benefits **REVERSED**. A judgment in Plaintiff's favor will enter.

### I. STANDARD OF REVIEW

To prevail on a claim for disability benefits under ERISA, a plaintiff must prove by a preponderance of the evidence that he was "disabled" within the meaning of the policy. *Javery v. Lucent Techs., Inc.*, 741 F.3d 686, 700 (6th Cir. 2014). "[I]t is irrelevant on *de novo* review whether a plan administrator's decision was principled or reasoned." *Id.* at 699. Rather, the Court's role on *de novo* review "is to determine whether the administrator . . . made a correct decision." *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808-9 (6th Cir. 2002). This requires the Court

to take a "fresh look" at the administrative record, "giving proper weight to each expert's opinion in accordance with supporting medical tests and underlying objective findings, and according no deference or presumption of correctness" to the decisions of the plan administrator. *Javery*, 150 F.3d at 615 (cleaned up).

"Preponderance of the evidence is defined as 'more likely than not.'" *See* Sixth Circuit Pattern Criminal Jury Instruction, 3.11A(3); *Williams v. Eau Claire Public Schools*, 397 F.3d 441, 446 (6th Cir. 2005) (trial court correctly instructed jury that a preponderance of the evidence is "such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in your mind[] belief that what is sought to be proved is more likely true than not true").

## II.     FACTUAL AND PROCEDURAL BACKGROUND

For a second time, David Johndrow seeks judicial review of Unum's denial of his claim for long-term disability ("LTD") benefits under an employer-sponsored disability plan pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 101 *et seq.* ("ERISA"). Plaintiff is a former employee of Massachusetts Medical Society. [LTD 55-56].[1] Unum Life Insurance Company of America (with Unum Group, "Unum") is the underwriter of group LTD insurance policy number 47-840002, issued to Plaintiff's former employer. [*Id.*].

On August 13, 2018, Johndrow experienced sudden neck and head pain and went to the emergency room, stating he was weak and dizzy. [LTD 911]. He has since been diagnosed with occipital neuralgia, a headache condition resulting from irritation of the occipital nerves which arise from the neck, and left shoulder pain. [LTD 2165]. He stopped work on September 9, 2018,

---

[1] For ease of reference, the administrative record is generally cited as "LTD," referring to the digits following Bates stamp UA-CL-LTD, filed as Docs. 19 through 19-7 and Docs. 46 through 46-7. The Policy is cited as "LTD POL," filed as Doc. 19-8.

and submitted his LTD claim on February 20, 2019. [LTD 5, 36]. Over the next few years, Johndrow pursued numerous treatments for his condition, including a number of occipital nerve blocks, two cervical epidural injections, facet blocks, medial branch blocks, BOTOX, and occipital nerve decompression surgery. [LTD 581; LTD 556-57; LTD 2291; LTD 552, 699; LTD 2291]. He has been prescribed a wide variety of prescription medications, including serious pain killers like fentanyl, morphine, and oxycodone. [LTD 1589, 2269, 3515, 3518]. As of June 4, 2024, Johndrow was apparently considered a candidate for another surgery due to his ongoing pain/headache condition. [Doc. 46-6 at 999]. Johndrow's medical history is set forth in greater detail in the Court's prior Order [Doc. 30], and familiarity with that history is assumed.

Unum initially denied Plaintiff's LTD claim, and he appealed. On appeal, Unum reversed its denial, finding that he was disabled due to mental illness. Because the Policy sets a 24-month limit on benefits payable on account of mental illness, Unum denied his claim for further LTD benefits, terminating his benefits on March 8, 2021. [*See* Doc. 72 at 5]. Plaintiff filed this action on November 30, 2021. [Doc. 1].

On August 31, 2023, the Court granted in part Plaintiff's prior Motion for Judgment on the ERISA Record [Doc. 20], remanding the case to the plan administrator. [Doc. 30]. After extensive review of the record and oral argument, the Court held that Unum erroneously denied benefits to Johndrow. [*Id.* at 31]. In particular, the Court noted that Unum's file-reviewing physicians discounted Johndrow's self-reported pain despite having never examined him and with no basis to believe he was malingering. [*Id.* at 18]. Johndrow's treating physicians, in contrast, uniformly opined that it was unlikely Johndrow was capable of full-time or competitive employment. [*Id.*].

Rather than awarding benefits, however, the Court found further factual development was necessary and remanded to the plan administrator. [*Id.* at 32]. In particular, the Court ordered the

plan administrator to obtain a relevant independent medical examination and/or appropriate physical exam of Mr. Johndrow prior to making a benefits determination.

### III.   POLICY PROVISIONS

The Policy [Doc. 19-8] defines disability as follows:

You are disabled when Unum determines that:

- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
- you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

[Doc. 19-8 at 16, POL-LTD 16]. The Policy defines "gainful occupation" as "an occupation that is or can be expected to provide you with an income at least equal to 80% of your indexed monthly earnings within 12 months of your return to work." [Doc. 19-8 at 35, POL LTD 37]. Plaintiff shows that his pre-disability earnings were $10,370.01 per month and his Indexed Monthly Earnings as of March 9, 2021, would have been approximately $11,251.25. [Doc. 72 at 4, n.2]. Consequently, Plaintiff shows (and Defendant does not dispute) that a gainful occupation under the Policy would be one that provided him with income of at least $9,001 per month. [*Id.*].

Neither party has presented any evidence of Johndrow's earning capacity. Plaintiff argues that Johndrow is not capable of gainful employment that provides him with an income of $9,000 a month. Unum does not respond to this earning capacity contention, arguing instead that Plaintiff

4

is capable of full-time sedentary work. Both parties rely exclusively on evidence related to his ability to work a roughly 40-hour work week, rather than his possible earnings. From this unanimity of focus, the Court infers agreement that only full-time work could meet the $9,000 per month income threshold.

## IV. ANALYSIS

Based on the record that was before the plan administrator, the Court must determine whether Plaintiff has proven by a preponderance of the evidence that he was "disabled" as defined by the Policy as of March 9, 2021. More specifically, Plaintiff must prove that, due to sickness or injury, he is unable to perform the duties of any "gainful occupation" for which he is reasonably fitted by education, training, or experience. Based on his undisputed prior earnings, a "gainful" occupation is one that would provide him with an income of at least $9,000 a month. The parties' briefing – and all the evidence cited – assumes this income threshold requires full-time work.

While the Court has reviewed significant portions of the administrative record, the parties highlight several pieces of evidence as most critical. Having previously summarized Plaintiff's medical records in great detail, the Court focuses on those pieces of evidence mentioned in post-remand briefing. Plaintiff relies on the sworn statement of Johndrow's treating neurologist, Dr. Kevin Kahn, the neurocognitive testing of neurologist Dr. Herfkens, and the treating physician statements of Drs. Reniva, Malapira, and Strand. Unum relies almost exclusively on the IME Report of Dr. Nadeem Khan. Unum also argues that Dr. Kevin Kahn's statement is inconsistent with his treatment notes and that Johndrow's reported pain is similarly inconsistent with his reported activities.

### 1. Overview of Treatment Record[2]

Following the onset of his headache condition in August 2018, Plaintiff did several months of physical therapy in late 2018, had numerous spinal palpitations done through mid-2019, and received manual therapy and dry needling. He was given cortisone injections, multiple Botox injections, numerous trigger point injections, roughly five trigeminal nerve blocks, and numerous occipital nerve blocks. He had bilateral medial branch blocks in early 2019 and again in late 2020. [LTD 552, 699]. In August 2019, he underwent occipital nerve decompression surgery. [LTD 2291]. He later had a lumbar drain in October 2020 and a lumbo-peritoneal shunt insertion in December 2020.[3] [LTD 2146-47]. On February 8, 2021, he had a "right radiofrequency ablation," and had a "left radiofrequency ablation" several weeks later. [LTD 13514]. He was prescribed numerous medications for pain during this period, including Gabapentin, muscle relaxers, prescription anti-inflammatories, Tramadol, Narcan, Zanaflex, triptan medications, and morphine. [*See, e.g.*, LTD 13491, 13498, 13508, 13534]. In late February 2021, he reported worsening frontal and temporal chronic headaches, though his occipital pain had improved since his August 2019 surgery. [LTD 13514].

As to imaging, in 2018, he had a CT scan of his head, x-rays of his cervical spine and left shoulder, and MRIs of his cervical spine and left shoulder. [LTD 13531]. In 2019 he had another MRI of his brain. [*Id.*]. In 2020, he had two separate MRIs of his cervical spine, two separate

---

[2] Dr. Khan's IME Report lists Johndrow's medical visits related to his headache condition from August 13, 2018, to March 12, 2024, summarizing each in a few sentences. The entries are succinct and chronological, creating a useful narrative of Johndrow's medical history. The Court has independently confirmed the accuracy of select entries and neither party suggests it contains errors. Given that the administrative record now exceeds 13,000 pages, the Court has relied on this section of the IME to compile a timeline of Johndrow's various treatments.

[3] Dr. Kevin Kahn later explained that Johndrow received a "programmable shunt - - meaning a way for spinal fluid to be released from his head through . . . a catheter." [LTD 12708].

MRIs of his thoracic spine, two separate MRIs of his lumbar spine, another MRI of his brain, and a CT scan of his cervical spine. [LTD 13531-32].

Plaintiff shows that from the time his benefits ceased in March 2021 to April 2024, he received over 20 trigger point injections, a lumbo-peritoneal shunt revision surgery in December 2021, and a deep occipital nerve decompression surgery in August 2022. [Doc. 72 at 12]; *see* [LTD 12708-12710; 13514-13530]; [LTD 13534 (noting 40+ trigger point injections)]. He also continued long-term opioid and pharmaceutical therapies, including fentanyl patches, ketamine infusions, and anticonvulsant medications. [*Id.*]. The IME report indicates he also went to countless psychotherapy sessions (largely related to his pain), had six CT scans of his head/brain, October 2021 and October 2023 x-rays of his lumbar spine, and a January 2022 MRI of his cervical spine. [LTD 13514-13530; LTD 13532-13533].

What is striking about these records is the sheer volume and variety of treatments that Johndrow received over the years. As Dr. Khan concluded, he "failed the conservative, interventional[,] and surgical treatments." [LTD 013539]. By the Court's count, he received a total of over 60 trigger point injections from July 2019 to December 2021 and over 20 occipital nerve blocks, at one point receiving them weekly.

Dr. Khan's medical chronology also lists Plaintiff's numerous psychotherapy visits. In the earlier visits, Johndrow reported: being able to manage his pain to see his daughter (November 13, 2019); inability to participate in activities due to severe pain (December 4, 2019); not experiencing relief from pain (December 19, 2019); being in bed for three weeks due to increased pain (January 6, 2020); increased pain and inability to concentrate / being overwhelmed (January 14, 2020); increased pain and having a lot of trouble concentrating (February 20, 2020); vomiting on a drive home due to increased pressure (March 17, 2020); increased pain and being in bed more (March 31, 2020). [Doc. 46-6 at 965-969]. After a gap, he apparently resumed psychotherapy in

7

February 2021, reporting struggling with memory (February 24, 2021), and more persistent headaches and difficulty concentrating (March 3, 2021).

In the psychotherapy visits following the end of his benefits period, Johndrow reported: struggling with memory (March 17, 2021); struggling to plan for his day (March 24, 2021); having memory issues (March 31, 2021); feeling frustrated when he forgets important things that affect other people (April 8, 2021); anxiety and frustration due to chronic headaches and deficits in cognitive functioning (April 21, 2021); not wanting to handle pain and headaches anymore (April 28, 2021); frustration with his headache condition (April 30, 2021); grief from chronic pain and his prostate cancer diagnosis (June 7, 2021); having a breakdown in the recovery room following removal of the lumbo-peritoneal shunt (June 30, 2021); worsening headaches (August 11, 2021); depression due to chronic pain (September 2, 2021); high levels of headache pain, increasing his anxiety (September 16, 2021); making mistakes in scheduling (September 23, 2021); struggling to have time to do tasks (September 30, 2021); making mistakes on his calendar and worsening headache (October 28, 2021); having headache pain worse than ever and struggling with his memory (November 18, 2021); wanting to get off pain medication (December 3 and 22, 2021); feeling depressed and extremely disappointed about his medical conditions (February 10, 2022); continued frustration with life due to medical conditions, especially chronic headaches (April 7, 2022); and feeling overwhelmed and frustrated to due cognitive issues (April 21, 2022).  [Doc. 46-6 at 975-986].

Around the spring of 2022, Johndrow's psychotherapy notes increasingly relate to depression, lack of desire to do anything, and feeling paralyzed. [LTD 13523-13525]. In November 2022, he reported that his depression had lessened as his headache pain had lessened since his August 2022 cervical decompression surgery. [LTD 13528]. He was discharged from psychotherapy in December 2022. [Id.]. He apparently returned to therapy in March 2023, and his

reports were much the same. [LTD 13529]. He reported, *e.g.* that after finding some pain relief, his headache pain had returned to normal and he could not get anything done. [*Id.*].

These entries are remarkable for their consistency and their focus on Johndrow's chronic headache pain. They are, of course, his subjective reports of pain and given for the purpose of psychotherapy, not direct medical treatment. But they are also contemporaneous accounts of his pain timeline, and they consistently reflect the connection between his headache pain and his experiences of depression and anxiety over a period of several years. They frequently align with his medical records, with psychotherapy notes about severe pain often preceding additional medical treatment or similar reports to Johndrow's other providers. The consistency of Johndrow's pain reports to his therapists and the extent to which they align with his other medical records make these entries more informative and reliable than they might otherwise be.

**2. Assessment of Limitations Forms**

Plaintiff points to the treating physician statements of primary care physician Dr. Faustino Reniva, neurologist Dr. Amelito Malapira, and pain management specialist Dr. Jonathan Strand. Each doctor submitted an "Assessment of Limitations" form for Johndrow in which they rated his abilities in seven categories: (1) abilities of concentration, persistence, and pace; (2) ability to deal with the stress of ordinary work; (3) ability to demonstrate reliability; (4) ability to persist at assigned tasks; (5) ability to relate to supervisors and coworkers; (6) ability to work at a consistent pace for acceptable periods of time; and (7) ability to timely complete tasks commonly found in work settings. *See* [LTD 2158-59]. The form asks that the abilities be rated as unlimited, good, fair, poor, or "none." [*Id.*].

Dr. Strand is a pain management specialist who treated Johndrow numerous times, beginning in December 2018, shortly after the onset of his headaches. [LTD 2945; LTD 1268-69]. According to the medical summary in the IME Report, Dr. Strand treated Johndrow at least 66

9

times between December 2018 and December 2021. *See* [Doc. 46-6 at 955-983]. His treatment included a multitude of occipital nerve blocks, bilateral medial branch blocks, and trigger point injections. [*Id.*]. Around August 2021, it appears Johndrow began seeing Dr. Strand on a weekly basis for these treatments. [*Id.*]. Dr. Strand noted "the only effective treatment was the occipital nerve blocks, which provided good relief, but only for a short time." [LTD 1269].

In his December 2019 Assessment of Limitations form, Dr. Strand rated Johndrow's abilities of concentration/persistence/pace, his ability to work at a consistent pace for acceptable periods, and his ability to timely complete common work tasks as "poor," and remaining abilities as "fair." [LTD 2158-2160]. He opined that Johndrow's condition would cause lapses in attention or memory daily for several hours a day, and that he could not reasonably be expected to be reliable in attending an 8-hour day, 40-hour work week in view of the degree of pain, fatigue, or other limitations he experienced. [*Id.*].

Dr. Malapira is a headache specialist who treated Johndrow several times in late 2019, apparently performing Botox injections.[4] In her March 2020 Assessment of Limitations form, she rated as "fair" Johndrow's ability to relate to supervisors and co-workers and ability to timely complete tasks commonly found in work settings. [LTD 2075-76]. She rated his abilities as "poor" in all five remaining categories and opined he could not work a 40-hour work week and would be expected to be absent more than four times a month. [*Id.*]. She believed his condition would cause lapses in his concentration or memory for several hours, 3 or more days a week. [*Id.*].

Dr. Reniva, Plaintiff's primary care physician, rated Plaintiff's abilities as "poor" in all seven categories. [LTD 2145-47]. He opined that Plaintiff's occipital neuralgia was likely to interfere with his work on a daily basis, and anticipated chronic absences at least four times a

---

[4] Dr. Khan's IME Report lists at least three visits with Dr. Malapira, on May 24, 2019, October 24, 2019, and November 19, 2019. [LTD 13499, 13502, 13504].

month. [*Id.*]. Like Drs. Strand and Malapira, Dr. Reniva opined that Johndrow was not able to work an 8-hour day, 40-hour work week. [*Id.*]. At the time he gave the medical opinion statement in March 2020, Dr. Reniva had been seeing Johndrow since at least April 2019.[5] [*See* LTD 2616].

While the Assessment of Limitations forms do not include significant analysis, they provide arguably the most concrete snapshot of whether and how often Johndrow's medical conditions are likely to interfere with the practical demands of full-time work. The opinions are uniform in supposing that Johndrow's pain and other symptoms will interfere with his ability to work "once or more daily," and result in chronic absences of at least 4 days a month. Dr. Malapira believed absences might be as high as 15 to 20 days a month. [LTD 2077]. Moreover, Drs. Strand, Reniva, and Malapira all treated Johndrow multiple times in person. Dr. Strand saw Johndrow literally dozens of times. Each of these doctors was asked whether Johndrow's subjective complaints "seem reasonable in view of your observations and diagnoses," and each said yes. [LTD 1364, 2159 & 2146].

### 3. Unum's File Review – Dr. Crawford

Unum's current briefing focuses almost exclusively on the IME Report. But it is worth noting the medical opinion on which it relied most heavily prior to remand – that of Unum employee and neurologist Dr. Jacqueline Crawford. Dr. Crawford reviewed Plaintiff's medical records prior to remand and concluded: "Though the insured's treatments are acknowledged, the insured's activity was inconsistent with an individual with headaches or occipital neuralgia which rose to the level of impairment from sedentary demands." [LTD 2988]. She concluded he was not impaired from sedentary occupational demands, i.e. mostly sitting with brief breaks, making judgments and decisions, communicating complex information, etc. [LTD 2986-87].

---

[5] It is not clear how long Dr. Reniva had been Johndrow's primary care physician, since the medical records begin at or about the time of Johndrow's headache/pain onset.

Crawford emphasized Johndrow's running and travel as inconsistent with his reported pain levels and noted that he gave inconsistent accounts as to whether running exacerbates his headache pain. [LTD 2988-89]. She opined that running "results in repetitive tightening of the muscles in the back of the neck," adjacent to the occipital nerves, so a person with an impairing degree of headache pain or occipital neuralgia would not be expected to train for and complete a marathon, as Johndrow did in March 2019. [*Id.*]. She also observed that his blog posts "are full of rich detail, excellent grammar, and a wit consistent with intact memory and communication skills." [*Id.*].

Dr. Crawford never mentions the contrary medical opinions of Drs. Strand, Reniva, or Malapira, and she missed or misstated critical details regarding Johndrow's treatment. Crawford either did not know about or did not mention Johndrow's occipital nerve decompression surgery, which is significant as she discounted his reported pain levels. She likewise believed that since his first ER visit in August 2018, he had not gone to the "emergency room or urgent care for headaches . . . as might be seen in an individual seeking relief of pain which rose to the level of impairment." [LTD 2988]. But Johndrow reported to multiple providers that he had to go to the ER in early April 2020 for extreme pain and submitted medical records for the visit, roughly a month and a half before Crawford issued her opinion. [LTD 2915, 7198, 13508]. After Dr. Crawford's initial opinion, Johndrow apparently went to "Sentara Norfolk General Hospital ED," presumably meaning emergency department, on September 24, 2020, for back pain and a "splitting" headache, that had begun three days earlier. [LTD 13512].

Similarly, Dr. Crawford appeared to believe the occipital nerve blocks were largely successful, lasting several weeks at a time. [*Id.*]. Johndrow, however, reported a much shorter effective time of 3-4 days, and Dr. Strand confirmed in a sworn statement that relief of three days is "fairly typical" for the treatment. [LTD 2191; LTD 2166]. Indeed, when Johndrow saw Dr.

12

Strand on April 29, 2020, he was told he would get injections weekly until he had further treatment with neurosurgery. [Doc. 46-6 at 696].

On *de novo* review, the Court is not concerned with whether omissions or errors may have skewed Unum's decision-making. Errors and omissions remain relevant, however, because the Court must weigh the medical opinion evidence. The facts that Dr. Crawford missed or misstated all speak directly to the magnitude of Johndrow's pain. Given that the crux of her opinion was that Johndrow's activities were inconsistent with his reported pain, the omitted and incorrect information significantly undermines her opinion that he was not disabled from sedentary work.

### 4. Neurocognitive Evaluation & Unum's Response

Dr. Kristine Herfkens conducted a neurocognitive evaluation of Plaintiff on March 2, 2020. [LTD 2798]. She estimated that his "premorbid level of abilities" were "in the high average range." [LTD 2799]. The neurocognitive testing revealed "mixed" results: Johndrow "showed weaknesses in attention/working memory and mental flexibility" and his "[v]isual memory was impaired." [*Id.*]. However, Johndrow reported he was exhausted and had a severe headache by the end of the test and "could not function well." [*Id.*]. Yet other areas, including information processing speed, language, spatial function, verbal learning/memory, and most aspects of executive function, were at "expected levels." [*Id.*]. Her evaluation indicated severe depression and moderate anxiety. [*Id.*].

Dr. Herfkens opined that Johndrow had "a mild neurocognitive disorder" that was "likely multifactorial." [*Id.* at 2780]. She wrote that while he was recently diagnosed with ADHD, there were "ample other factors" that could be interfering with attention, include chronic migraines, medication, and marked depression and anxiety. [*Id.*]. Finally, she opined:

> I do not believe that Mr. Johndrow is capable of competitive employment. His treating physician will need to speak to the intractability of his migraine, but in general chronic severe pain interferes with most aspects of life. It is highly unlikely that he could consistently work an 8-hour day or a 40-hour week. Cognitively, he would need to work in a distraction-free environment at his own pace, with the

13

ability to stop work frequently, sometimes for extended periods, to get relief from headaches.

[LTD 2800].

Unum asked Dr. Edan Critchfield to review Dr. Herfkens' neurocognitive evaluation. [LTD 2930]. In an April 24, 2020, file review, Dr. Critchfield noted that despite Johndrow's history of ADHD and a reading disorder, "his scores on multiple measures of attention and working memory were average to superior." [*Id.*]. In particular, she noted:

- Verbal measures ranging from average to high average, visual measures ranging from high average to superior, average to high average processing speed, and average to high average working memory.

- Scores relating to attention within the average to high average range, with a few isolated low scores "on measures that could be impacted by his history of a reading disorder." [LTD 2930].

- Performance on verbal memory in the average range and within expectation.

- Visual memory performance lower than expected.

- Regarding executive functioning, divided attention was average and measures of problem-solving and mental flexibility were average to superior.

Dr. Critchfield discounted Johndrow's lower than expected visual memory performance based on embedded performance validity measures that were below expectation. She noted his cognitive profile "reflected an unusual pattern where he performed better on a more challenging version of measure." [*Id.*].

In sum, Dr. Critchfield disagreed with Dr. Herfkens, opining that "claimant's cognitive profile does not reflect a clear pattern of impairment in attention, working memory, or mental flexibility, or impairment in any other domain." [*Id.* at 2931]. She opined that the evaluation did

14

not reflect cognitive deficits of a nature or severity that would result in functional impairment or that would support a cognitive diagnosis. [*Id.*]. In a response letter, Dr. Critchfield maintained that Johndrow's performance in sustained attention had "multiple weak indices, indicating a high likelihood of a neurocognitive disorder characterized by inattentiveness, poor sustained attention, and poor vigilance." [LTD 3184]. She also stated that Critchfield was mistaken about embedded validity indicators being below expectations, asserting the data showed it was "within normal limits." [*Id.*].

Dr. Herfkens conducted a second neurocognitive evaluation of Johndrow on February 13, 2024. [LTD 12659-12663]. "Compared to the 2020 evaluation, which resulted in a diagnosis of mild cognitive impairment, there was mild worsening in verbal memory and information processing speed." [LTD 12661]. Her results showed weak sustained visual attention and contextually based memory, while "[m]ost other test performances were at or near Mr. Johndrow's predicted baseline abilities." [*Id.*]. Dr. Herfkens concluded that Johndrow "continues to meet criteria for mild neurocognitive disorder." She opined the cause was "likely multifactorial," with factors including "chronic pain and chronic pain medication [that] interfere with cognitive efficiency." [*Id.*]. She confirmed her prior opinion that Johndrow was not capable of competitive employment. [*Id.*].

The 2020 and 2024 neurocognitive exams indicate a mild neurocognitive impairment/disorder. While Dr. Herfkens and Dr. Critchfield disagreed about what the neurocognitive exam showed, both neurologists offered credible and reasoned opinions. Dr. Herfkens gave a somewhat more detailed explanation of the test results and she also examined Johndrow in person. That her updated 2024 evaluation showed essentially the same areas of

weakness and strength adds to its weight. At the same time, Dr. Herfkens noted only a mild cognitive disorder.

### 5. Medical Opinion of Dr. Kevin Kahn

Plaintiff's central piece of evidence on remand is the sworn statement of Dr. Kevin Kahn. Kahn is board-certified in neurology, pain medicine, and headache medicine, and has treated Johndrow since April 2020. [LTD 12705-06]. According to the IME medical visit detail, he treated Johndrow at least 13 times between April 2020 and July 2023, mostly via tele-medicine visits. Dr. Kahn explained the numerous procedures and treatments Johndrow received, including nerve decompression, placement of stimulators, and "procedures to adjust his spinal fluid pressure." [LTD 12708]. He explained that some of these procedures/treatments had complications. For example, one procedure to adjust Johndrow's spinal fluid pressure reduced the pressure too much, ripping his blood vessels and causing a brain hemorrhage. [*Id.* at 12708-09].[6] Dr. Kahn characterized Johndrow's various treatments as "palliative at best." [LTD 12709]. He explained that they keep him from being in "terrifying, severe pain," but do not remove his pain. [*Id.*]. He opined that given the duration of Johndrow's symptoms, it was unlikely that anything would remove his pain fully. [LTD 12710].

As to pain management medication, Dr. Kahn explained that he has tried multiple anticonvulsant medications to address nerve pain, and that Johndrow has "had all the new migraine treatments to no avail." [LTD 12710]. He averred that the other measures they have used just keep Johndrow in a "moderate state of pain . . . instead of severe." [*Id.*]. According to Dr. Kahn, Johndrow "never has a moment in the day without pain," "[i]t is always there to some degree." [LTD 12711]. He averred there were moments when his pain might be mild due to his medications,

---

[6] The IME Report likewise notes that on May 23, 2021, Johndrow had a brain hemorrhage, "likely secondary to the pressure being released in his shunt." [LTD 13516].

"[b]ut unfortunately, those times make him less functional because of the medicine." [*Id.*]. Dr. Kahn stated that Johndrow is the only patient to whom he has prescribed intranasal ketamine as a treatment for severe spikes of pain. [*Id.*]. He explained that it is quite effective for a few hours, but makes Johndrow less functional. [*Id.*]. According to Dr. Kahn, Johndrow has Oxycodone "which he uses a few times a week for breakthrough pain," but which is also sedating. [LTD 12712]. "[H]e exists in moderate to severe pain with his maintenance pain medicine which is a fentanyl patch." [*Id.*].

Dr. Kahn stated that he has decades of experience treating patients with chronic pain and headaches. In that time, he had seen "plenty" of people with chronic pain who may have been malingering or embellishing their pain. In contrast, Dr. Kahn did not see "red flags" with Johndrow, who he said communicated his pain management status clearly. In Dr. Kahn's assessment, Johndrow was not malingering or "drug-seeking," and had to be convinced to even consider trying opioid medications. [LTD 12712]. "He uses breakthrough medicine a few times a week rather than a few times a day." [LTD 12713].

As to functioning, Dr. Kahn opined that while Johndrow may be able to play guitar or be online for half an hour, it "is an achievement," particularly compared to his prior high levels of cognitive functioning. [LTD 12715]. "If he tries to do sustained activity, it typically drags him down." [*Id.*]. If he is on a screen too long or moves around a lot, his pain increases, so he has to do short increments of activity. [*Id.*]. As to cognitive functioning, Dr. Kahn explained that pain is very distracting, making it difficult for a person to have a continuous train of thought. [LTD 12716].

Dr. Kahn opined: "[W]hile he certainly could probably do short bursts of activity, the reality is that no employer would be able to tolerate an employee who can only do that; who can, you know, perhaps work for 30 minutes, down for two hours, work for 30 minutes, down for three

17

hours, have a spike of pain where they may be out . . . the rest of the day, need medication . . for breakthrough pain . . . several times a week that leaves him not able to think clearly at all." LTD 12717-17]. In short, "it's painfully obvious that he can't function, and I don't think he's going to be able to function." [LTD 12719].

Unum challenges Dr. Kahn's sworn statement as inconsistent with his medical records, pointing to notes from his two most recent visits with Johndrow. [Doc. 74 at 11]. Johndrow submitted notes in advance of a March 3, 2023, appointment. He reported considering teaching music part time when his disability case resolved; stated fentanyl works best and he is "cognitively the most clear"; stated he was using occasional ketamine as a rescue and some oxycodone; reported he was "getting longer more productive days" on certain medications; stated he was having trouble staying asleep; and reported switching from one prescription to another "in hope of extending my functionality." [LTD 7836].

Dr. Kahn's notes indicate that a Butrans patch "was not effective and made him nauseated with vomiting" and that oxycodone interferes with his cognition. [*Id*]. He notes Johndrow "has been more active on this regimen," but "with increased activity he has severe breakthrough pain." [*Id.*]. "Ketamine spray works quickly lasting about 90 minutes which gets him through the current task until he can lie down later. He rarely uses it." [*Id.*]. The notes say he uses oxycodone for breakthrough pain as well, but even less frequently. [*Id.*]. The notes reflect one severe headache day, 27 moderate headache days, and zero mild or no headache days in the preceding weeks. [*Id.*].

Unum next points to a July 6, 2023, encounter note, in which Dr. Kahn stated Johndrow "has done reasonably well for quality of life improvements with fentanyl patch with intranasal ketamine for breakthrough pain." [LTD 7824]. The note recounts that oxycodone interferes with his cognition, and that he has required less Ritalin and Valium since being on a fentanyl patch and especially since his surgery. [*Id.*]. "Overall function has improved with this regimen." [*Id.*].

The Court agrees that Dr. Kahn's narrative account of Johndrow's pain appears a touch overblown compared to his medical notes, but the dissonance is not as discrediting as Unum imagines. For one, observing improvement in a patient's well-being is clearly relative: debilitating pain may simply become less debilitating and still be correctly called an improvement. It is a matter of context, which Unum omits from the very same encounter notes. In the July note observing improvement, Dr. Kahn also wrote that since his last visit, Johndrow had "resigned to live his life with his pain," that a previously-recommended medication did not work, and that another provided incomplete relief. [LTD 7821]. The note indicates 28 severe headache days, a huge jump from the March report of only one. [*Id.*]. Johndrow reported that when he had a headache, it was "very often" severe and "very often" limited his ability to do daily activities. [*Id.*]. He reported that in the previous four weeks, his headache had "always" affected his ability to concentrate on work or daily activities. [*Id.*]. The note reports "[h]e is in constant pain but has made several coping strategies which help with his medications." [LTD 7823]. While the March and July encounter notes temper Dr. Kahn's statement somewhat, they do not suggest it is entirely off base.

Unum also challenges Dr. Kahn's assessment of Johndrow's pain state based on Johndrow's reported activities. This issue was discussed at length in the Court's prior Memorandum Opinion [30], but suffice to say that taken in context, Johndrow's social media, limited travel, writing, and other activities do not persuasively undermine his reported pain. There is really no dispute that Johndrow can engage in some activities. The more relevant question is whether he can sustain activity and if so, for how long. Like much of the evidence Unum points to, the report that he made progress with two books needs some additional context. In that same December 2023 psychotherapy note, Johndrow reported on one hand that he had more contact with other people and was making progress on his books. [LTD 10332]. But he also reported that

after a week without pain, the pain returned, that his headaches were "much more severe again," that he was "feeling foggy again," etc. [*Id.*]. Unum also notes his travel to Europe, but omits that three days after getting back, he reported "new onset of increasing headache," which felt like a "[c]leaver down the center of [his] head." [LTD 11640]. He had increased his fentanyl patch without improvement. [*Id.*]. He reported to his psychotherapist several days later that he had not felt well on his trip and would not have gone if he had known he would feel this way. [*See* LTD 13529].

### 6. IME Report

Dr. Nadeem Khan is a spine and pain management specialist who performed an independent medical examination of Johndrow on June 3, 2024. [LTD 13490-13543]. Either Johndrow or his wife recorded the IME, apparently without Dr. Khan's knowledge. At the conclusion of the IME, Dr. Khan stated: "I don't think, sir, you can work or function," and "I don't think, sir, you can go back to work." [Doc. 53-4 at 60]. In contrast, the IME Report concludes that Plaintiff "can perform sedentary level duties as long as his chronic pain is under control pharmacologically." [LTD 13538].

### a. Dr. Khan's IME Report

The IME Report first summarizes Plaintiff's medical record: Provided Medical Record Related to Current Injury Reviewed, Radiological Data Prior to Current Injury, and Radiological Data Related to Current Injury. These brief entries date from January 2, 2018, to March 12, 2024, and comprise 43 ½ pages of Dr. Kahn's 53-page report. The chronological list of Plaintiff's extensive medical visits, treatments, and imaging provides a concise, detailed timeline of his medical condition.

The Report identifies Johndrow's chief complaint as headache and neck pain, with an unidentified mode of onset. [Doc. 46-6 at 995; LTD 13534]. It notes the duration is constant but

fluctuates in severity, is aggravated by looking up or down, bending to either side, coughing, stress, etc. [*Id.*]. It also notes his surgical history, including bilateral greater occipital nerve decompression in 2019, C2 and C3 nerve decompression in 2022, failed occipital nerve stimulation trial in 2019, and an "LP Shunt" placed in 2020 and removed in 2021. [LTD 13535].

In his physical exam, Dr. Kahn noted as to the cervical spine: "Limited range of motions in all planes (flexion, extension, rotation, and bending)." [LTD 13536]. He also noted decreased range of motion and left paraspinal spasms in the thoracic spine exam. [*Id.*].

The IME Report notes that Johndrow had been diagnosed and treated for, *inter alia*, chronic persistent headache and neck pain; cervical spondylosis at cervical spine; syrinx foci at T7-8 and T11-12; degenerative change at C6-7; mild degenerative disc disease, etc. [LTD 13537].

Dr. Khan was asked to answer four questions. Each is paraphrased below, and Dr. Khan's answers are summarized and discussed.

> i. **Question #1: Excluding impairment related to behavioral health, is Johndrow <u>currently</u> precluded from performing the physical and/or cognitive demands of his sedentary level occupation?** [7]

Dr. Kahn opines that Johndrow is physically capable of performing sedentary work, able to sit "most of the time," and can walk or stand for brief periods. [*Id.* at 999]. He opines that he was able to recall and provide his medical history in detail. [*Id.*]. Dr. Kahn notes that for his

---

[7] Several questions posed to Dr. Khan reference a term that is purportedly "defined above," but no definition appears in the report. Similarly, several questions refer to "his occupation." Question #1 asks, e.g., whether Johndrow can perform the physical and/or cognitive demands of "his sedentary level occupation (defined above)." [Doc. 46-6 at 999]. Question #3 asks whether he was incapable of performing "the <u>cognitive demands of his occupation</u> (defined above) as of 3/9/21." [*Id.* at 1000]. Similarly, Question #4 asks whether Johndrow was incapable of performing "the physical demands of his occupation (defined above) as of 3/9/21." [Doc. 46-7 at 2]. It is not clear if Dr. Khan was provided with any of these definitions, though an IME Request document defines "occupational demands" for an Architect IT Solutions role, as well as "skilled work." [Doc. 46-6 at 904].

"chronic headache and cervical pain," Johndrow has "undergone the standard of care," trying "bilateral rhomboid, trapezius, corrugator, temporalis trigger point injections." [*Id.*]. He also "failed medial branch blocks, medial branch ablations, BOTOX, Epidural steroid blocks, Occipital nerve decompressions and blood pressure control." [*Id.*]. Despite these observations, Dr. Khan opines that Johndrow "can perform sedentary level duties as long as his chronic pain is under control pharmacologically." [*Id.*].

> ii. **Question #2: Excluding impairment related to behavioral health conditions, does the medical evidence support that Johndrow's functional capacity has deteriorated since March 9, 2021?**

Dr. Khan does not answer this question directly. Instead, he responds:

> He is having chronic headache and neck pain, which has not responded to non-surgical and surgical interventions. He had failed the conservative, interventional and surgical treatments. He is on long term opioid therapy (Fentanyl 25 mcg) to help his chronic intractable pain. He is being offered C6-7 anterior cervical discretomy and fusion.

> Since 03/09/2021 his medical and psychological issues are being monitored and taken care [of] according to the standard of care. He is able to carry out his activities of daily living with current pharmacological pain management. His cervical range of motions are limited and painful in all planes but [he] has normal strength in both upper limbs.

[*Id.* at 1000]. Without a direct answer, it is not clear how to apply this response to the question before the Court. Regardless, neither party contends that Plaintiff's medical condition has materially changed since March 9, 2021.

> iii. **Question # 3: Excluding consideration of cognitive impairment due to Johndrow's psychiatric conditions, does the medical evidence support that Johndrow was incapable of performing the <u>cognitive</u> demands of his occupation as of March 9, 2021?**

Dr. Khan does not provide a direct answer to this question either. He responds by listing a sampling of Johndrow's Facebook posts dating back to 2015, e.g.: "10/13/2018 – Patient posted

a fundraiser to attend the Tokyo Marathon in March of 2019." [LTD 13539]. He notes that Johndrow had multiple Facebook pages about marathons, with no dates. He summarizes undated Instagram photos of "nature, art, paintings, family, marathons, and travels." [*Id.*]. He notes a news article from March 2019 about Johndrow's participating in the Tokyo Marathon, his 80th race since he started running in March 2012. [*Id.*]. He notes a blog that Johndrow apparently maintained from September 2011 to May 2019. [*Id.*].

Dr. Kahn then recites Johndrow's condition, reported pain, and physical exam findings, e.g. limited cervical range of motion and normal strength and reflexes in upper limbs. [*Id.*]. He notes that Johndrow reports short-term and long-term memory lapses, depression, stress, and anxiety, and that Valium helps with some of these symptoms. [*Id.*]. Dr. Khan recites Johndrow's report that he can walk one to one and a half miles, and the surgery he was offered. [*Id.*]. Seemingly out of nowhere, Dr. Khan concludes: "He is able to do sedentary level functions when we exclude behavioral health." [LTD 13541].

Again, Dr. Khan's answer is not directly responsive to the question: whether Johndrow was incapable of performing the cognitive demands of "his occupation" as of March 9, 2021, leaving aside behavioral health factors. Presumably, Dr. Khan's recitation of Plaintiff's online activities (many of them undated) and his March 2019 marathon is intended to suggest that he is cognitively capable of performing sedentary tasks.

Dr. Khan's opinion has little weight in this regard for several reasons. First, Unum's question to Dr. Khan is highly suggestive, pointing to "the Insured's reported activities (distance running, taking an art class, playing guitar, cooking, driving, blogging/writing," and travel to Europe [6/20/23 encounter note]." It is not clear what online materials were provided to Dr. Khan, so the Court cannot know if he saw the numerous references to pain and difficulty in those same materials. [*See* Doc. 30 at 27-28]. Dr. Khan's references are also largely undated, and they suggest

a significant decline in Johndrow's physical activity. For example, Dr. Khan notes that Johndrow ran a marathon in March 2019, but that he now reports walking only one or one and a half miles a day.

More significantly, Dr. Khan's conclusion has no explanation or reasoning. To the extent Johndrow's history of running, blogging, and posting on social media relate to his cognitive function as of March 9, 2021, the Court is not persuaded that they weigh against a finding of disability. To the contrary, they seem to suggest that Johndrow gradually decreased his online and physical activities in the year that followed his headache onset, eventually engaging in drastically fewer activities than he previously had.

> **iv. Question #4: Excluding consideration of impairment related to behavioral health conditions, does the medical evidence support that Johndrow was incapable of performing the <u>physical</u> demands of his occupation as of March 9, 2021?**

Like Question 3, this question requests explanation and suggests for consideration Johndrow's reported activities of "distance running, taking an art class, playing guitar, cooking, driving, blogging/writing [Phone Calls and Social Media posts 2019 to 2021]; travel to Europe," etc. [*Id.*].

Dr. Khan gives a clearer answer here:

> I have reviewed his social media activates [sic] and the information provided (summarized above) I have reached with the reasonable degree of medical probability that he is able to do the sedentary level functions when we exclude behavioral health. His cognitive functions are within normal limits. He is able to stand and walk. He has reported that he is able to walk one to one and [a] half miles.
>
> He does report headaches, concentration issues, memory issue[s], intermittent confusion, stress, depression and anxiety. These falls [sic] mostly under his behavioral and psychological issues, which would be deferred.

[LTD 13539]. While more express in his opinion, Dr. Khan does not explain why Plaintiff's "headaches, concentration issues, memory issue[s], intermittent confusion, stress, depression and

anxiety" fall "mostly" under behavioral or psychological challenges. To the Court's knowledge, there is no evidence in the record that Johndrow's headaches arise from any behavioral health condition.

### 7. Dr. Khan's Deposition Testimony

While discovery is typically unavailable in ERISA cases, Plaintiff was granted leave to conduct limited discovery due to procedural irregularities on remand. Plaintiff urges that Dr. Khan's deposition testimony should now be considered by the Court in resolving the merits of the case. On *de novo* review, the Court is generally confined to the record that was before the plan administrator. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615 (6th Cir. 1998). Courts in the Sixth Circuit interpret *Wilkins* as recognizing a narrow exception to this rule: a court *may* receive new evidence "when consideration of that evidence is necessary to resolve an ERISA claimant's procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Id.* (Gilman, J., concurring). Administrator bias is irrelevant on *de novo* review, see *Javery*, 741 F.3d at 699, so outside evidence could not come in for that purpose. It is less clear how a procedural / due process challenge would impact the scope of *de novo* review.

Regardless, both parties rely on Dr. Khan's deposition testimony in their briefing. Unum lodges a nominal objection, but then cites the deposition at some length. Importantly, Unum cites the deposition for the purpose of bolstering Dr. Khan's credibility with regard to its central piece of evidence – the IME Report.

Moreover, the Court previously found that Unum did not timely issue a decision on remand, in accordance with 29 C.F.R. § 2560-503-1(i)(1)(i) and (i)(3)(i). It further found that both governing regulations and the Policy itself required Unum to provide Plaintiff "the opportunity to review and respond to any new or additional rationale or evidence considered, relied upon, or

generated by the plan in connection with [the] claim," as required by the Policy. [Doc. 17-8 at 49]. That indisputably did not happen here: Unum did not provide Plaintiff with Dr. Khan's IME report until November 6, 2024, months after the denial of his claim. [*See* Doc. 52 at 5; Doc. 43 at 4, n.2]. This is significant because Unum premised its denial almost entirely on the IME Report, while refusing to consider the audio recording of the IME itself.[8]

The Court finds Unum has waived any objection to consideration of Dr. Khan's deposition testimony by relying on that testimony in briefing and oral argument, and in particular, by relying on that testimony to bolster his credibility in relation to the IME Report. In the alternative, the Courts finds that consideration of the deposition is an appropriate cure for Unum's procedural irregularities on remand, particularly its failure to provide Plaintiff with new evidence supporting its benefits determination prior to denying benefits.

The Court has therefore considered the deposition transcript to a limited extent. For avoidance of doubt, the Court clarifies that its decision would be the same with or without the deposition testimony of Dr. Khan.

### 8. Analysis of IME Report

Dr. Khan's IME Report concludes that Johndrow can work if his pain is controlled pharmacologically. But there is little reason to believe that is the case. Dr. Khan never explicitly opines that Johndrow's pain is in fact controlled pharmacologically, and his Report suggests otherwise in several respects. Critically, Dr. Khan never saw the sworn statement of treating physician Dr. Kevin Kahn, which speaks directly to the frequency and severity of Johndrow's pain. Whether taken at face value or viewed in the context of the larger administrative record, Dr.

---

[8] No one disputes that the IME transcript is properly part of the record. Unum did not consider that recording, but Plaintiff submitted it as part of the administrative record, prior to Unum's denial of benefits.

Khan's IME Report does not compel the conclusion that Johndrow's pain is pharmacologically controlled such that he can perform full-time sedentary work. Finally, Dr. Khan's statement that Johndrow could not "work or function" somewhat undermines his later written opinion that he could do sedentary work. The deposition transcript does little to explain away this inconsistency.

First, there is ample suggestion in the Report that Johndrow's pain was and continues to be only nominally managed by his numerous treatments and pain medications. Dr. Khan himself characterizes Plaintiff's pain as "chronic" and "intractable," i.e. "not easily relieved or cured." *Intractable*, Merriam-Webster, https://www.merriam-webster.com/dictionary/intractable (last visited March 10, 2026). The Report notes that Johndrow "failed medial branch blocks, medial branch ablations, BOTOX, Epidural steroid blocks, Occipital nerve decompressions and blood pressure control." [Doc. 46-6 at 999]. It states that Johndrow's pain "has not responded to non-surgical and surgical interventions," and that he has "failed conservative, interventional and surgical treatments." [*Id.* at 1000]. In both the physical exam and opinion portions of the Report, Dr. Khan noted that Johndrow's cervical range of motion was "limited and painful in all planes." [*Id.*]; [*Id.* at 997 ("Limited range of motions in all planes (flexion, extension, rotation, and bending).")]. Without Dr. Khan's conclusory opinion that Johndrow can work, one could easily read the IME Report and conclude that none of Johndrow's numerous treatments have effectively controlled his pain for any meaningful period of time.

Indeed, very little in the IME Report supports that Johndrow's medication regimen was effective such that he could work full-time. As to his physical functioning, Dr. Khan opines without explanation that Johndrow "is able to carry out his activities of daily living with current pharmacological pain management," adding that "[h]is cervical range of motions are limited and painful in all planes but [he] has normal strengths (sic) in both upper limbs." [LTD 13539]. Elsewhere, Dr. Khan notes that he "is able to stand and walk," and that he reports walking one to

one and a half miles. [LTD 13541]. That alone suggests drastic decline in function, given that Johndrow had previously run 80 races between 2012 and 2019, including multiple marathons. The Court fails to see how being able to stand and take a short walk – with "intractable" pain and a cervical range of motion that is "limited and painful in all planes" – demonstrates that a patient is capable of full-time work.

Nor does Dr. Khan explicitly opine that Johndrow is cognitively capable of full-time work; that conclusion is at most implied. In response to Question #4 about his physical capacity, Khan states that Johndrow's "cognitive functions are within normal limits." [LTD 13541]. Question #3 asks about Johndrow's cognitive capacity. In lieu of analysis, Dr. Khan responds with select references to Johndrow's online presence and activities. The bulk of the activities mentioned are either undated or predate Johndrow's headache onset, and the rest fizzle out no later than mid-2019. For example, Johndrow's blog was only maintained until May 2019, and there is no evidence he engaged in any distance running after March 2019. The IME Report summarily concludes that Johndrow can do "sedentary level functions when we exclude the behavioral health." [LTD 13541].

Like Unum's file reviewing doctors, Dr. Khan zeroed in on isolated reports of activity, disregarding (or perhaps unaware of) Johndrow's frequent references to pain and loss of function in those same reports. Perhaps Dr. Khan did not have the benefit of that context. Regardless, while he summarized Johndrow's reports of pain to his treating therapists and physicians, he does not appear to have considered these contemporaneous accounts of Johndrow's pain. And nothing in the IME Report suggests that Johndrow was exaggerating or malingering. In his deposition, Dr. Khan agreed there was "[n]o question" that Johndrow "has a problem," and that he "has a legitimate pathology." [Doc. 72-1 at 70]. Indeed, the only people who suggest Johndrow is

exaggerating are Unum's attorneys and the Unum-employed physicians who never saw or treated Johndrow.

Second, Dr. Khan did not have the benefit of critical evidence that Johndrow's pain was not pharmacologically controlled: the sworn statement of Johndrow's treating physician regarding the frequency and severity of his headache pain. Recall that Dr. Kevin Kahn opines that Johndrow's pain is always present, that he has pain spikes, that he regularly loses the ability to function for hours at a time, and that during those times, he has to lie down and/or take narcotic pain medication that makes it difficult for him to function. On *de novo* review, the Court can credit some, all, or none of Dr. Kahn's sworn statement, and give that evidence whatever weight the Court believes it deserves in view of the larger medical record.[9] To that end, the Court finds some aspects of Dr. Kahn's statement to be less credible, specifically his suggestion that Johndrow's pain medications only keep him from being in a "terrifying" state of pain, and his comments on how frequently Johndrow experiences breakthrough pain / pain spikes requiring "rescue" medications.

On the other hand, the Court finds credible the treating physician's account of the regularity of Johndrow's headache pain, its impact on his functioning, and its resistance to treatment. Dr. Kahn specializes in pain management and headache medicine and has for decades. He was Johndrow's treating physician, and treated him at least thirteen times over three years. He was familiar with Johndrow's history, treatments, and prescriptions, and was able to give specific

---

[9] *See Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1025 (8th Cir. 2021) ("The district court reviews the decision of an administrator who lacked discretionary authority *de novo*, acting as factfinder on the administrative record."); *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (where plan does not grant discretionary authority, district court reviews *de novo*, "with respect to both the plan administrator's interpretation of the plan and the plan administrator's factual findings"); *Wilkins*, 150 F. 3d at 619 (Gilman, J., concurring) (on *de novo* review, district court should "render findings of fact and conclusions of law" solely based on the administrative record).

details of failed treatments. He was also candid in agreeing that some patients do exaggerate their symptoms, and specific in explaining why he did not believe that to be true of Johndrow. While this was not deposition testimony, it was not a written declaration either. So Dr. Kahn's level of familiarity with Johndrow's record and his ability to fluidly explain his impressions still enhance his credibility. Moreover, his statements in this regard are corroborated by other evidence in the record. That Johndrow tried numerous ineffective medications, that he failed both non-surgical and surgical interventions despite receiving the standard of care, the undisputed reduction in his physical activity, and the willingness of both doctor and patient to continue to pursue invasive procedures to relieve his pain all support the proposition that Johndrow's pain is not meaningfully controlled pharmacologically.

Thus, even if Dr. Kahn's assessment of Johndrow's pain is slightly overblown in places, it carries some weight. Analytically, it is the piece of the puzzle that the IME is missing, as it answers the question left open by the IME: whether Johndrow's pain is pharmacologically managed. Dr. Kevin Kahn's sworn statement says it is not, and further explains how Johndrow's pain medications contribute to his concentration and memory issues. As the IME Report stops short of concluding that Johndrow's pain is controlled by his prescription regimen, Dr. Kevin Kahn's sworn statement is critical to discerning the true import of the IME opinion.

Third and finally, Dr. Khan's written opinion that Johndrow is capable of full-time, sedentary work is undercut by his statement to Johndrow that he did not believe Johndrow could "work or function." Defendant attempts to explain away this contradiction by pointing to Khan's deposition testimony, but the deposition only further muddies the waters. In several places, Dr. Khan appears to be explaining why his opinion changed, all while insisting that it did not. There are many possible reasons for this seeming inconsistency, not the least of which is Dr. Khan's impressive but incomplete English language proficiency. Another source of confusion appears to

be Unum's reference to "his occupation" in the IME questions. Under the Policy, the question is whether Johndrow can perform the demands of any occupation, not whether he can return to his prior occupation. Yet another point of confusion was whether Johndrow's prior occupation required more than sedentary-level work. There is no reason to believe Dr. Khan testified dishonestly, but suffice to say the deposition does not clarify matters.

At bottom, Dr. Khan told Johndrow unequivocally that he could not "work or function," and later opined that he could perform full-time sedentary work. Given the lack of analysis in the IME Report, this apparent conflict does slightly undermine his IME conclusion.

## V.      DISABILITY DETERMINATION

With thousands of pages of evidence in the record, it is helpful to recall the key question: Whether Plaintiff has shown, by a preponderance of the evidence, that he was disabled within the meaning of the Policy as of March 9, 2021. He is disabled if he is unable to perform the duties of any "gainful occupation" for which he is reasonably fitted by education, training, or experience. A "gainful" occupation is one that would provide him with an income of roughly $9,000 a month. Throughout the briefing, the parties use full time, sedentary work as a proxy for this income threshold. Under a preponderance of the evidence standard, Plaintiff has met his burden if the evidence weighs somewhat in his favor.

Having carefully reviewed the evidence, the Court finds that as of March 9, 2021, Johndrow was disabled within the meaning of the Policy and is entitled to an award of benefits. The assessment of limitations from Drs. Reniva, Strand, and Malapira, the sworn statement of Dr. Kahn, the objective evidence from Dr. Herfkens' report and Johndrow's physical exams, and even aspects of the IME Report support that Johndrow is unable to sustain gainful employment. As to the medical opinion evidence, the Court need not give these opinions decisive weight. Yet "a court is under no obligation to ignore the fact that a treating physician's greater experience with a

31

plaintiff may, depending on the context of the case, provide the physician with a superior basis for making certain determinations." *Boersma v. Unum Life Ins. Co. of Am.*, 546 F. Supp. 3d 703, 714 (M.D. Tenn. 2021). That principle is particularly relevant where, as here, "evaluating and interpreting the patient's own account of [his] symptoms is so important to [his] diagnosis." *Id.*

And while the objective evidence of cognitive impairment is far from overwhelming, "pain often evades detection by objective means." *Brooking v. Hartford Life & Accident Ins. Co.,* 167 Fed. Appx. 544, 549 (6th Cir. 2006). Johndrow's physical exam results also constitute objective evidence of pain. *See id.* (record contained objective evidence of pain where functional capacity exam revealed "external indicators of pain such as facial grimacing, and deviations in posture and movement patterns"). The IME Report and other treatment records contain such objective evidence, noting Johndrow's limited range of motion, areas of tenderness, and pain with movement.[10]

The centerpiece of Unum's defense, the IME Report, does not rebut Plaintiff's evidence of disability, and in certain respects, supports a disability finding. Dr. Khan's opinion that Johndrow can do sedentary work is contingent on his pain being controlled pharmacologically, but there is ample evidence that it is not. As Dr. Khan recognized, Johndrow's headache pain has not responded to myriad non-surgical and surgical treatments, and numerous medications have failed. His treating physicians uniformly believe him to be incapable of full-time work.

---

[10] According to the IME chronology, different physicians noted pain during their physical exams, for example: "decreased range of motion and tenderness to left shoulder and neck (October 9, 2018); "moderate tenderness to palpation along cervical paraspinals . . . decreased range of motion with flexion, extension, and lateral rotation" (January 18, 2019, and March 13, 2019); left shoulder and neck tenderness (April 9, 2019); tenderness over cervical facets C2 and C3 (September 30, 2019). Similarly, Dr. Kleiber, noted an "elicitable trigger point" of "greater occipital and lesser occipital nerves bilaterally." [ER 2294]. Dr. Ducic noted that his exam "objectively confirmed . . . tenderness over involved nerves." [ER 788].

32

Case 1:21-cv-00296-CEA-CHS   Document 78   Filed 03/19/26   Page 32 of 34
PageID #: 22880

In the end, whether David Johndrow is disabled does not rise or fall on whether he survived a trip to Europe in 2023, or ran one last marathon in 2019. His writing and online posting say little of whether he can sustain activity for any meaningful period, much less for 7 to 8 hours a day, 40 hours a week. The most forceful conclusion one can draw from the IME Report is that Johndrow can work *if* his pain is pharmacologically controlled. But that's never really been the question in this case. It is Johndrow's inability to control his headache pain and the resultant decrease in cognitive and physical capacity that he contends is disabling. He has presented ample evidence that his pain is not sufficiently controlled to allow him to sustain activity for the hours required to work full-time in any occupation.

After four years of litigating its obligations under the Policy, Unum must now provide Johndrow with the benefits to which he has long been entitled. Plaintiff argues benefits should be awarded from March 9, 2021, through the date of judgment. Unum does not specifically address this contention, and has therefore conceded the point. Moreover, both parties rely on evidence over the course of many years, including records long after the March 9, 2021, termination of benefits date. Unum obviously disputes disability, but does not argue that Johndrow's condition is any different now than it was in March 2021. Accordingly, Johndrow is entitled to continued long term disability benefits beginning March 9, 2021.

## VI. CONCLUSION

Upon *de novo* review of the record, the Court finds that Plaintiff has shown by a preponderance of the evidence that he was disabled within the meaning of the Policy and entitled to long-term disability benefits as of March 9, 2021. Accordingly, Unum's denial of Plaintiff's claim for long-term disability benefits is **REVERSED** and Plaintiff's Motion for Judgment on the ERISA Record [Doc. 69] is **GRANTED**.

A judgment in Plaintiff's favor shall separately enter.

33

**SO ORDERED.**

/s/ Charles E. Atchley, Jr.
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**